IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MULTISCAFF LIMITED,          )
                                   )
        Plaintiff,         )
                                   )
        v.            )         Civil Action No. 3:23CV22 (RCY)
                                   )
APTIM FEDERAL SERVICES, LLC,  )
                                   )
        Defendant.       )
                                   )

## MEMORANDUM OPINION

This matter is before the Court on Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue ("Motion to Dismiss," ECF No. 19). The motion has been briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated herein, the Court will deny the Motion to Dismiss.

## I. PROCEDURAL HISTORY

Plaintiff Multiscaff Limited ("Multiscaff") filed its Complaint on January 10, 2023 (ECF No. 1). Defendant Aptim Federal Services, LLC ("APTIM") filed the present Motion to Dismiss for Lack of Jurisdiction and Improper Venue (ECF No. 19) and its Memorandum in Support of its Motion to Dismiss (ECF No. 20) on February 15, 2023. On February 24, 2023, Plaintiff filed its Motion for Enlargement of Time to File Response/Reply to Defendant's Motion to Dismiss (ECF No. 22). The Court granted the motion (*see* ECF 23), and on March 8, 2023, Plaintiff filed its Memorandum in Opposition to Defendant's Motion to Dismiss (ECF No. 24). Defendant filed its Reply on March 14, 2023 (ECF No. 25).

On June 16, 2023, the Court ordered Defendant to produce and file a copy of the "Prime Contract" between APTIM and the Air Force Civil Engineer Center ("AFCEC") (ECF No. 38). Defendant complied on June 16, 2023 (ECF No. 39).   On June 26, 2023, the Court ordered each party to submit supplemental briefs clarifying where the Prime Contract was executed and what state law governs the interpretation of the Prime Contract (ECF No. 43).   On July 5, 2023, Defendant and Plaintiff responded to the Court's order by filing their respective memoranda.  (ECF Nos. 45, 47.)

## II. LEGAL STANDARD

### A. Personal Jurisdiction – Rule 12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) allows a Defendant to move to dismiss the Plaintiff's claim for a federal court's lack of personal jurisdiction over the Defendant.  Fed. R. Civ. P. 12(b)(2).  "[W]hen the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a prima facie showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016).  "[T]he court must construe all relevant pleading allegations in the light most favorable to [plaintiffs], assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).  All factual disputes must also be resolved in the plaintiff's favor. *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993).

### B. Improper Venue – Rule 12(b)(3) and 28 U.S.C. § 1406(a)

Federal Rule of Civil Procedure 12(b)(3) allows a party to move to dismiss a case for "improper venue." Fed. R. Civ. P. 12(b)(3).   Rule 12(b)(3) is the "proper mechanism for defendants seeking to raise an objection to improper venue" under 28 U.S.C. §1406(a). *Symology*

*Innovations, LLC v. Lego Sys., Inc.*, 282 F. Supp. 3d 916, 924 (E.D. Va. 2017) (citing *W. Va. Chamber of Commerce v. Browner*, 166 F.3d 336, 1998 WL 827315, at *4 n.6 (4th Cir. 1998)). Title 28 U.S.C. § 1406 provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). When deciding whether to transfer or dismiss, "district courts generally favor transfer over dismissal, unless there is evidence that a case was brought in an improper venue in bad faith or to harass defendants." *Conte v. Virginia*, No. 3:19CV575, 2020 WL 3883251, at *4 (E.D. Va. July 9, 2020) (quoting *Symbology Innovations, LLC*, 282 F. Supp. 3d at 935).

In the Fourth Circuit, when facing an improper venue challenge under Rule 12(b)(3) and 28 U.S.C. § 1406, the "plaintiff bears the burden of establishing that venue is proper." *Symbology Innovations*, 282 F. Supp. 3d at 925 (aggregating cases); *Adhikari v. KBR, Inc.*, No. 1:15cv1248, 2016 WL 4162012, at *3 (E.D. Va. Aug. 4, 2016). To survive an allegation of "improper venue when no evidentiary hearing is held, the plaintiff need only make a prima facie showing of venue." *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). On such a motion, the Court is "permitted to consider evidence outside the pleadings." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 366 (4th Cir. 2012). In determining whether the plaintiff has made a prima facie showing, courts "view the facts in the light most favorable to the plaintiff." *Id.* at 356–66.

### III. STATEMENT OF FACTS

On February 28, 2017, Defendant APTIM entered into an indefinite delivery, indefinite quantity contract with the Air Force Civil Engineer Center ("AFCEC"). ("IDIQ Contract," ECF No. 45-1.) The IDIQ Contract incorporated by reference Defense Federal Acquisition Regulation

Supplement Contract Clause 252.233-7001 – Choice of Law (Overseas) (the "DFAR Clause").

(*Id.* 38, 44, 46.)  The DFAR Clause reads:

> This contract shall be construed and interpreted in accordance with the substantive laws of the United States of America. By the execution of this contract, the Contractor expressly agrees to waive any rights to invoke the jurisdiction of local national courts where this contract is performed and agrees to accept the exclusive jurisdiction of the United States Armed Services Board of Contract Appeals and the United States Court of Federal Claims for the hearing and determination of any and all disputes that may arise under the Disputes clause of this contract.

Defense Federal Acquisition Regulation Supplement Contract Clause 252.233-7001 Choice of Law (Overseas) (June 1997).

Under the IDIQ Contract, AFCEC issued APTIM task orders for various projects.  Relevant to this suit, on July 25, 2018, AFCEC issued a task order for APTIM to perform repair work on storage tanks located at Naval Support Facility Diego Garcia ("NSF Diego Garcia"), a United States Military installation on the island of Diego Garcia in the British Indian Ocean Territory (generally, "the Project").  (Compl. ¶ 6, ECF No. 1; "Task Order," ECF No. 39-1.)

On December 1, 2018, APTIM entered into a subcontract (the "APTIM-FPL Subcontract," ECF No. 20-3) with Ferrous Protection Limited ("FPL").  (*Id.* ¶ 7.)  The APTIM-FPL Subcontract was negotiated and executed in Dallas, Texas.  (Decl. Todd Schmidt ¶ 5, ECF No. 20-1.)  At the time of the execution of the Subcontract in 2018, APTIM had its principal place of business in Alexandria, Virginia.  (Decl. Aidan Delgado ¶ 3, ECF No. 20-1.)

The APTIM-FPL Subcontract defined the contract between AFCEC and APTIM as the "Prime Contract," AFCEC as the "Client," APTIM as the "Company," FPL as the "Subcontractor," and APTIM and FPL as the "Parties."  (APTIM-FPL Subcontract 1, 6.)[1]  The APTIM-FPL

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions.

Subcontract contained provisions that are relevant to the jurisdictional dispute here.  First, the

APTIM-FPL Subcontract contained a "flow-down" provision that stated:

> 10. LOWER TIER SUBCONTRACTING
> Subcontractor shall not subcontract the whole of the Subcontract Work. Subcontractor shall not subcontract any part of the Subcontract Work without prior written approval of Company. Any lower tier sub-subcontractor retained must be contractually bound to all obligations set forth herein just as Subcontractor is bound to Company. Subcontractor further agrees to bear sole responsibility for payment of any amounts to lower tier sub-subcontractors. Company shall be made a third party beneficiary of all lower tier subcontracts.

(*Id.* 10.)  The APTIM-FPL Subcontract also contained a choice of law clause ("Subcontract Choice

of Law Clause") that read:

> 30. GOVERNING LAW
> Each Subcontract shall be governed by and interpreted pursuant to the rules and laws of the state governing the Prime Contract, without regard to its conflict of law provisions. In the absence of state laws governing the Prime Contract, a) the Subcontract shall be governed by and interpreted pursuant to the rules and laws of the state in which the Prime Contract work is being performed, or b) if the Prime Contract work is performed outside of the United States, the Subcontract shall be governed by and interpreted pursuant to the rules and laws of the United States and the State of Virginia , without regard to their conflict of law provisions.

(*Id.* 21.)   Additionally, the APTIM-FPL Subcontract contained a forum selection clause

that read:

> 31. DISPUTES
> A Claim is a demand or assertion by one of the Parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of these T&C's [Terms & Conditions] or a Subcontract. The term "Claim" also includes any other disputes and matters in question between Company and Subcontractor arising out of or relating to these T&C's or a Subcontract. The responsibility to substantiate Claims shall rest with the Party making the Claim.
> . . .
> If the Parties are unable to resolve Claims by direct negotiation, the sole and exclusive venue for any litigation between Company and Subcontractor relating to or arising from any Subcontract, these T&C's, any Project, or any Subcontract Work, except as provided by the following paragraph, shall be the United States District Court for the Eastern District of Virginia, or, should that court lack jurisdiction, Alexandria Circuit Court.
> . . .

5

The foregoing notwithstanding, if Company in good faith believes that any claim, dispute or other matter in controversy with Subcontractor also involves the rights or liabilities of the Client, then Subcontractor agrees, upon Company's demand, to resolve such issues in the same forum and proceeding, including arbitration, court, or administrative authority, which has jurisdiction over some or all claims, disputes and matters in controversy involving Company and Client, so as to promote economy and avoid inconsistent results. In the event that the related dispute is an arbitration, Subcontractor consents to joinder in such arbitration proceedings, and this agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof, and any award shall be binding and may be enforced by any court having jurisdiction thereof. Subcontractor agrees to include similar clauses in all of its subcontracts, and Subcontractor will ensure that this requirement flows down to all tiers of sub-subcontractors.

(*Id.* 21–22.)

On January 29, 2019, FPL entered into a sub-subcontract (the "Multiscaff Sub-Subcontract," ECF No. 20-4) with Plaintiff Multiscaff Limited ("Multiscaff"), a company based in Lancashire, England, whereby Multiscaff agreed to provide and maintain scaffolding and sheeting, along with dedicated personnel, for the Project. (Compl. ¶¶ 2, 9.) Under "Conditions of Contract," the Multiscaff Sub-Subcontract states: "These will be back to back as per our contract – copy supplied." (Multiscaff Sub-Subcontract 2.) APTIM was not a party to the Multiscaff Sub-Subcontract. (*Id.*)

In July of 2020, APTIM relocated its principal place of business to Baton Rouge, Louisiana and no governance or decision-making has been performed in Alexandria, Virginia since the relocation. (Decl. Aidan Delgado ¶ 5.)

In December of 2020, FPL purported to terminate the Multiscaff Sub-Subcontract. (Compl. ¶ 20.) From August 2021 to November 2021, APTIM communicated with Multiscaff regarding APTIM's use of the materials provided by Multiscaff. (*Id.* ¶ 22.) Having not received a payment for use of the building materials and not having had the materials returned to it, on January 10, 2023, Multiscaff initiated the present litigation against APTIM. (*Id.* ¶ 23.)

6

## IV. DISCUSSION

Plaintiff hinges its arguments in favor of personal jurisdiction and venue on the validity and enforceability of the forum selection clause contained in the APTIM-FPL Subcontract.  The key inquiry in this suit is determining whether that forum selection clause is valid and enforceable and what effect it has on the question of personal jurisdiction and venue.  Prior to determining whether the forum selection clause in the APTIM-FPL Subcontract is valid and whether the flow-down provision in the APTIM-FPL Subcontract encompasses the forum selection clause, the Court must determine which law to use in interpreting the APTIM-FPL Subcontract.  Therefore, the Court's analysis will begin with determining which law to employ in interpreting the APTIM-FPL Subcontract.

### A. Choice of Law Analysis

#### 1. Validity of the Subcontract Choice of Law Clause

In this instance, as quoted, *supra*, the APTIM-FPL Subcontract contains a choice of law clause.  Before determining which law the Subcontract Choice of Law Clause selects, the Court must first determine whether that Clause itself is valid.  A federal court exercising diversity subject matter jurisdiction applies the choice of law principles of the forum state.  *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 623–24 (4th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941).  In this case, that means the Court will apply the choice of law principles of the state of Virginia.

"Under Virginia law, parties to a contract are free to specify the law that governs their agreement."  *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021) (citing *Union Cent. Life Ins. Co. v. Pollard*, 26 S.E. 421, 422 (Va. 1896)).  "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances."  *See Hitachi*, 166 F.3d at

624 (citing *Tate v. Hain*, 25 S.E.2d 321, 324 (Va. 1943)). Thus, the Subcontract Choice of Law Clause is valid under Virginia law. [2]

### 2. Selection of the Applicable Law

After concluding that the APTIM-FPL Subcontract Choice of Law Clause is valid, the Court now turns to determining which law that Clause selects. The first portion of the Subcontract Choice of Law Clause states that "[e]ach Subcontract shall be governed by and interpreted pursuant to the rules and laws of the state governing the Prime Contract." (APTIM-FPL Subcontract 21.) In this instance, the IDIQ Contract is the Prime Contract. The IDIQ Contract itself has a choice of law clause—the DFAR Clause—that simply states "[t]his contract shall be construed and interpreted in accordance with the substantive laws of the United States of America." Defense Federal Acquisition Regulation Supplement Contract Clause 252.233-7001 Choice of Law (Overseas) (June 1997). Notably, the IDIQ Contract does not specify what "state law" should govern its interpretation. While the DFAR Clause states that the IDIQ Contract shall be governed by the substantive laws of the United States, the IDIQ Contract does not point to a specific state law that governs that contract. Defendant states that this language means that the IDIQ Contract, and in turn the APTIM-FPL Subcontract, should be interpreted according to federal common law, citing *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988). The Court disagrees.

---

[2] The Court reaches the same conclusion regarding the validity of the choice-of-law clause, if it analyzed the question based on contract law principles, rather than conflict of laws principles. The analysis would proceed as follows, but the conclusion reached would be the same. Virginia choice of law principles dictate that that "[q]uestions concerning the validity, effect, and interpretation of a contract are resolved according to the law of the state where the contract was made." *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004) (citing *Woodson v. Celina Mut. Ins. Co.,* 177 S.E.2d 610, 613 (Va. 1970)). According to Virginia choice of law principles, a contract is made where "the last act to complete it is performed." *Id.* In this case, the APTIM-FPL Subcontract was executed in Texas. (Decl. Todd Schmidt ¶ 5.) Thus, under Virginia choice of law principles, the Court will analyze the Subcontract Choice of Law Clause under Texas law to determine its validity. Texas law gives effect to contractual choice of law provisions. *Brock v. Entre Computer Centers, Inc.*, 933 F.2d 1253 (4th Cir. 1991) (citing *First Commerce Realty Investors v. K–F Land Co.*, 617 S.W.2d 806, 808–09 (Tex. Civ. App. 1981)). Thus, the Subcontract Choice of Law Clause is likewise valid under Texas law.

*Boyle* involved tort liability claims brought by the father of a deceased United States Marine against a government contractor who had allegedly manufactured a defective helicopter escape hatch. *Id.* at 502. At trial, the petitioner succeeded on his Virginia-law-based tort claims against the contractor. *Id.* at 503. However, the Supreme Court subsequently held that federal common law—not Virginia state law—applied to the suit, and in doing so, created a narrow exception to the general rule that federal pre-emption of state law only occurs if there is a "clear statutory prescription" or a direct conflict between the two bodies of law. *Id.* at 504. In outlining a two-step process for the application of federal common law over state law, the Supreme Court stated that: (1) the suit must concern "an area of uniquely federal interest," and (2) there must exist a "significant conflict . . . between an identifiable federal policy or interest and the [operation] of state law." *Id.* at 504, 507; *see also Kormendi/Gardner Partners v. Surplus Acquisition Venture, LLC*, 606 F. Supp. 2d 114, 117 (D.D.C. 2009); *Affinity Empowering, Inc. v. Eurofins Sci., Inc.*, No. CV 21-1843-GBW, 2022 WL 6734604, at *5 (D. Del. Oct. 11, 2022). Specifically, the Supreme Court found that "the procurement of equipment by the United States is an area of uniquely federal interest," *Boyle*, 487 U.S. at 507, and that the design allegedly required by state law was "precisely contrary" to the design specified by the government contract. *Id.* at 509.

Here, Defendant has not identified any federal interest, let alone a federal procurement interest, that would warrant the application of federal common law of contracts over state law. Courts in the Fourth Circuit have interpreted *Boyle* narrowly as applying federal common law "whenever the allegedly tortious decisions attributed to the contractor are actually discretionary decisions made by the government itself." *Aegis Def. Servs., LLC v. Chenega-Patriot Grp., LLC*, 141 F. Supp. 3d 479, 488 (E.D. Va. 2015) (quoting *Emory v. McDonnell Douglas Corp.*, 148 F.3d

347, 352 (4th Cir. 1998)).  Here, neither party has identified any decision of a contractor that is actually a discretionary decision of the federal government.

Rather than resembling *Boyle*, the present case more closely resembles *Miree v. DeKalb County*, 422 U.S. 25 (1977), which involved the question of "whether certain private parties could sue as third-party beneficiaries to an agreement between a municipality and the Federal Aviation Administration."  *Id.* at 506.  The *Boyle* Court summarized the holding in and reasoning behind the *Miree* decision, noting that

> state law was not displaced [in *Miree*] because the operations of the United States in connection with FAA grants such as these . . . would [not] be burdened by allowing state law to determine whether third-party beneficiaries could sue, and because any federal interest in the outcome of the [dispute] before us [was] far too speculative, far too remote a possibility to justify the application of federal law to transactions essentially of local concern.

*Id.* at 506 (alternations in original) (internal quotations and citations omitted).  Additionally, the *Miree* Court stated that federal law should not apply because "the resolution of petitioners' breach-of-contract claim against respondent [would] have no direct effect upon the United States or its treasury."  *Miree v. DeKalb Cnty*, 433 U.S. 25, 29 (1977).  In the present suit, like in *Miree,* there is no federal interest at stake and no evidence that the federal government would be burdened or affected by the application of state law.  As such, it is not appropriate to read the language in the IDIQ Contract as warranting the application of federal common law as it relates to contract interpretation.

Given that the IDIQ Contract fails to identify any specific state's laws that govern it, the Court turns to the second portion of the APTIM-FPL Subcontract's Choice of Law Clause, which states that "[i]n the absence of state laws governing the Prime Contract . . . [and] if the Prime Contract work is performed outside of the United States, the Subcontract shall be governed by and interpreted pursuant to the rules and laws of the United States and the State of Virginia, without

regard to their conflict of law provisions." (APTIM-FPL Subcontract 21.) Here, there is absence of clear "state law" that governs the IDIQ Contract as that contract does not specify which specific "state law," governs the contract. Additionally, the work being conducted on NSF Diego Garcia was work that was performed outside of the United States. As such, the Subcontract Choice of Law Clause dictates that the contract be governed by and interpreted pursuant to Virginia contract law. Accordingly, the Court will apply Virginia law.

### B. Application of the Forum Selection Clause

Having determined that Virginia law applies to the interpretation of the APTIM-FPL Subcontract, the Court turns to the task of interpreting the remaining terms within the contract according to Virginia law. Specifically at issue in this case is the forum-selection clause of the APTIM-FPL Subcontract. On its face, this clause only contemplates disputes between APTIM and FPL. However, Multiscaff argues that the forum selection clause of the APTIM-FPL Subcontract applies to this dispute via the flow-down provisions found elsewhere in the Subcontract, which in turn incorporate the forum selection clause into the obligations described in the Multiscaff Sub-Subcontract. In opposition, APTIM claims that the flow-down provisions of the APTIM-FPL Subcontract do not apply to the forum selection clause, and thus Multiscaff is neither bound by nor empowered to enforce that clause. To resolve the question, the Court looks to Virginia contract law to determine whether the flow-down provisions of the APTIM-FPL Subcontract encompass the forum selection clause and thus incorporate that forum selection clause into the Multiscaff Sub-Subcontract.

"A court's primary focus in considering disputed contractual language is to determine the parties' intention." *Pocahontas Min. Liab. Co. v. CNX Gas Co., LLC*, 666 S.E.2d 527, 531 (Va. 2008). The Fourth Circuit has synthesized Virginia's "four corners" rule, noting that:

> Under Virginia law, courts adhere to the "plain meaning" rule in interpreting and enforcing a contract.  "Where an agreement is complete on its face[and] is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself . . . .  This is so because the writing is the repository of the final agreement of the parties."  In interpreting a contract, a court should read the contract as a single document and give meaning to every clause where possible.  Such an interpretation gives effect to the "presumption that the parties have not used words aimlessly."

*Hitachi*, 166 F.3d at 624 (quoting *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983); *Winn v. Aleda Constr. Co*., 315 S.E.2d 193, 195 (Va. 1984)).  "The search for this plain meaning does not myopically focus on a word here or a phrase there.  Instead, it looks at a word in the context of a sentence, a sentence in the context of a paragraph, and a paragraph in the context of the entire agreement."  *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 355 (Va. 2019).  "No word or phrase employed in a contract will be treated as meaningless if a reasonable meaning can be assigned to it, and there is a presumption that the contracting parties have not used words needlessly."  *Pocahontas Min. Ltd. Liab. Co.*, 666 S.E. 2d at 531.  This position encapsulates the supremacy-of-text canon of legal textual construction.

"If the terms are vague or ambiguous, then [courts] may consider extrinsic evidence to interpret those provisions."  *Providence Square Assocs., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000).  Additionally, "[i]f the plain meaning is undiscoverable, Virginia courts apply the *contra proferentem* canon, which construes ambiguities against the drafter of the ambiguous language.  *Erie Ins. Exch.*, 822 S.E.2d at 355.  "An ambiguity exists when the contract's language . . . is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time."  *Id.*  However, "[t]he mere fact that the parties disagree about the meaning of the contract's terms is not evidence that the contract language is ambiguous."  *Id.*  "Under Virginia law, conflicting interpretations reveal an ambiguity only where they are reasonable."  *Erie Ins. Exch.*, 822 S.E.2d at 355.  "A 'reasonable' or 'fairly claimed'

interpretation is one of two competing interpretations that are 'equally possible' given the text and context of the disputed provision." *Id.* at 356.

Although the plain text of the forum selection clause only covers litigation between APTIM and FPL as the parties to the APTIM-FPL Subcontract, Multiscaff argues that the forum selection clause is broad and mandatory and covers the current litigation even though the dispute is not between APTIM and FPL and does not involve a breach of contract claim. (Mem. Opp'n Mot. 7, 11–13, ECF No. 24.) Multiscaff points to the fact that Section 31 of the APTIM-FPL Subcontract states that the contract's dispute resolution requirement flows down to all tiers of sub-subcontractors, and that Section 10 of the APTIM-FPL Subcontract binds all lower tier sub-subcontractors, like Multiscaff, to the obligations contained within the APTIM-FPL Subcontract, which includes the forum selection clause. (*Id.* 8.) In support of this second argument, Multiscaff posits that the Court should consider the extrinsic evidence of the Multiscaff Sub-Subcontract, which contains a "back to back" condition similarly incorporating all of the APTIM-FPL Subcontract obligations into the Multiscaff Sub-Subcontract to likewise bind Multiscaff. (*Id.*) Lastly, Multiscaff argues that the forum selection clause applies even though this dispute does is not a breach of contract claim based directly on the terms of the APTIM-FPL Subcontract, because it is a dispute "related to or arising out of" Project-related work. (*Id.* 11.)

In response, APTIM contends that the forum selection clause does not encompass this suit because the forum selection clause specifically only covers litigation between APTIM and FPL, not between APTIM and any other sub-subcontractor like Multiscaff. (Reply 2, ECF No. 25.) Additionally, APTIM argues that the so-called dispute resolution clause in Section 31 "applies only to the provisions of this paragraph pertaining to disputes that also involve [AFCEC]," not any and all disputes between APTIM and any other lower tier subcontractors like Multiscaff. (*Id.* 3.)

Furthermore, APTIM argues that the flow-down provision in Section 10 of the APTIM-FPL Subcontract makes APTIM "a third-party beneficiary of any such lower-tier [sic] subcontract," but that "no reciprocal rights against APTIM are granted to a lower-tier [sic] subcontractor." (*Id.* 4.) In other words, APTIM contends that the obligations of the forum selection clause "flowed down, not up, the contractual chain," and thus did not bind APTIM to Multiscaff. (*Id.* 5.) Finally, APTIM disputes Multiscaff's attempt to broadly apply the forum selection clause to a non-breach-of-contract claim.(Mem. Supp. Mot. 8, ECF No. 20.)

The Court considers each of Multiscaff's arguments in turn.

### 1. Section 31's Flow Down Provision

Section 31 of the APTIM-FPL Subcontract is broken up into multiple paragraphs: the forum selection clause is contained in the fourth paragraph, and the purported dispute resolution clause is contained in the sixth paragraph. The sixth paragraph preserves AFCEC's rights as the "Client" and states that if a dispute between APTIM and FPL involves the rights or liabilities of AFCEC, then FPL consents to "resolve such issues in the same forum and proceeding . . . which has jurisdiction over some or all claims . . . involving [APTIM] and [AFCEC]." (APTIM-FPL Subcontract 22.) At the end of the sixth paragraph, the final sentence—which Multiscaff has dubbed the dispute resolution clause—states that "[FPL] agrees to include similar clauses in all of its subcontracts, and [FPL] will ensure that this requirement flows down to all tiers of sub-subcontractors." (*Id.*)

When ascertaining the plain meaning of the so-called dispute resolution clause, the Court looks to the context in which it appears in the APTIM-FPL Subcontract. *Erie Ins. Exch.*, 822 S.E.2d at 355. Reading the dispute resolution clause in the context of the sixth paragraph of Section 31, it is clear that the "flow down" language applies only to the clauses and obligations

contained in that specific paragraph related to protecting AFCEC's interests, and it does not relate back to the forum selection clause contained in the fourth paragraph of Section 31.  This reading is further supported by the fact that Section 31 has two more paragraphs after the sixth paragraph; had the contract's drafters intended the purported dispute resolution clause to relate back and encompass all of the contents of Section 31, they presumably would have included the dispute resolution clause at the *end* of Section 31, rather than the middle.  Finally, the sixth paragraph's first sentence makes clear that it is creating a framework separate and apart from paragraph four's forum selection clause.  (*See* APTIM-FPL Subcontract 21–22 ("The foregoing notwithstanding . . . .").)  This further supports the Court's conclusion that paragraph six does not relate back to or encompass the preceding paragraphs, insofar as the application of paragraph six's flow down language is concerned.  Accordingly, the Court finds that the dispute resolution clause in the sixth paragraph of Section 31 cannot be a means for the forum selection clause in the fourth paragraph to flow down to Multiscaff.

### 2. Section 10's Flow Down Provision

Next, the Court turns to an analysis of Section 10 of the APTIM-FPL Subcontract.  On its face, the flow down provision in Section 10 states that "[a]ny lower tier sub-subcontractor retained must be contractually bound to all obligations set forth herein just as [FPL] is bound to [APTIM]." (APTIM-FPL Subcontract 10.)  The last sentence of Section 10 also states that "[APTIM] shall be made a third-party beneficiary of all lower tier subcontracts."  (*Id.*)  The forum selection clause in Section 31 places an obligation on both APTIM and FPL to litigate their claims in the Eastern District of Virginia.  (*Id.* 21).  The parties offer competing interpretations as to the meaning of the flow down provision in Section 10, as it relates to the forum selection clause in Section 31.  Multiscaff argues that Section 10 specifically binds all lower tier sub-subcontractors, including

itself, to all of the obligations included in the APTIM-FPL Subcontract, which includes the forum selection clause in Section 31.  APTIM offers a different interpretation of the flow down provision in Section 10 and contends that Section 10 only grants APTIM rights against lower tier sub-subcontractors but does not grant any reciprocal rights to a lower tier sub-subcontractor against APTIM.  APTIM also notes that the APTIM-FPL Subcontract elsewhere contains several provisions that explicitly require FPL to include certain clauses in its lower tier sub-subcontracts, but that the forum selection clause has no such provision.  According to APTIM, this omission is indicative of an intent *not* to pass along FPL and APTIM's obligations with respect to forum selection.

Given the text of the APTIM-FPL Subcontract, both parties' interpretations appear to be "reasonable" on their face, *Erie Ins. Exch.*, 822 S.E.2d at 356, and thus the Court finds that the language of Section 10 of the APTIM-FPL Subcontract is "ambiguous."  *Pocahontas Min. Ltd. Liab. Co.*, 666 S.E. 2d at 531.  APTIM's position reflects the *expressio unius est exclusio alterius* canon of construction, insofar as it would have the Court determine that the express omission of flow down language in Section 31's fourth paragraph carries a negative implication, precluding the application of such language from elsewhere in the contract.  Multiscaff, however, argues that adopting APTIM's interpretation would invalidate Section 10's clear language and lead to absurd results, and that it would be illogical to conclude that the contract's drafters intended such outcomes.  Because the parties' reasonable competing interpretations of Section 10 make its meaning ambiguous, the Court can consider "extrinsic evidence" outside of the four corners of the APTIM-FPL Subcontract in order to interpret Section 10.  *Providence Square Assocs., L.L.C.*, 211 F.3d at 850.  The Court also construes any ambiguities against APTIM, as the the drafter of the ambiguous language.  *Erie Ins. Exch.*, 822 S.E.2d at 355.

In doing so, the Court finds that APTIM's interpretation of the flow down provision and the forum selection clause is not supported by the evidence before the Court.  The flow down provision binds any lower tier sub-subcontracts to the obligations of the APTIM-FPL Subcontract, in the same way that FPL is bound to APTIM.  While APTIM's interpretation of the flow down provision may be appropriate in interpreting a unilateral obligation that FPL owed to APTIM, it is not appropriate when the obligation binds both APTIM and FPL bilaterally and equally.  An example of a unilateral obligation which specifically binds only FPL, of which there are many in the APTIM-FPL Subcontract, is Section 9 (Assignment), which states:

> *Without prior written approval of [APTIM], [FPL] shall not assign or transfer* its rights and/or obligations, in whole or in part, under any Subcontract or these T&C's nor shall any share or interest arising out of or in any way related to any Subcontract or these T&C's or the Subcontract Work be in any manner or degree transferred or assigned by [FPL], whether directly or indirectly, and whether related to performance of the Subcontract Work, provision of financing, existence of or prosecution of a dispute or otherwise.

(APTIM-FPL Subcontract 5 (emphases added).)  In contrast to this language, the forum selection clause is an example of a bilateral obligation that binds both APTIM and FPL, as it clearly states that "the sole and exclusive venue for *any litigation between [APTIM] and [FPL]* . . . shall be the United States District Court for the Eastern District of Virginia." (*Id.* 21.)  Thus, while APTIM's interpretation of the flow down provision—that it only benefits APTIM—may be appropriate in interpreting other (i.e., unilateral) clauses of the APTIM-FPL Subcontract, it is not appropriate in interpreting the forum selection clause as that clause binds both APTIM and FPL equally.  Reading the flow down provision in the context of the forum selection clause, it is clear that the flow down provision applies to the forum selection clause and in turns binds any lower tier sub-subcontractors to the obligation of litigating a dispute in the Eastern District of Virginia just as the forum selection clause bound FPL, a subcontractor, to litigate any disputes it had with APTIM in the Eastern

17

District of Virginia as well.  Furthermore, a contrary reading adopting APTIM's one-directional-flow argument would permit APTIM to employ the forum selection clause when it saw fit against lower tier sub-subcontractors but avoid the application of forum selection clause against itself when a lower tier sub-subcontractor, like Multiscaff, attempted to hold APTIM to the forum selection clause's mandate.  The Court declines to adopt a reading that would lead to this absurd result.

Furthermore, in considering extrinsic evidence, the Court turns to the Multiscaff Sub-Subcontract.  The Multiscaff Sub-Subcontract between FPL and Multiscaff provides additional context on how the APTIM-FPL Subcontract affected other agreements with lower tier sub-subcontractors.  Under the "Conditions of Contract" section of the Multiscaff Sub-Subcontract, the contract simply states "These will be back to back as per our contract – copy supplied." (Multiscaff Sub-Subcontract 2.)  "Back to back" denotes an industry term indicating that the conditions in a subcontract coordinate with the conditions in a main agreement.  General Contract Clauses: Subcontracting, "Subcontract Back-to-Back with Main Contract," Practical Law Standard Clauses 3-521-4457, WestLaw (2023).  The goal of employing a "back to back" condition is to avoid creating disparities between the subcontract and the main contract.  *Id*. Besides the "back to back" clause, there are no other enumerated conditions under the "Conditions of Contract" heading.  Thus, it is clear that the parties to the Multiscaff Sub-Subcontract drafted the contract with the intent and understanding that all of the conditions of the APTIM-FPL Subcontract would flow down to bind Multiscaff as well.

In response, APTIM points to a number of clauses in the APTIM-FPL Subcontract that specifically state that FPL shall include similar language in lower tier sub-subcontracts[3] as

---

[3] These clauses state, in part: (cont'd)

18

evidence that the drafters of the APTIM-FPL Subcontract only wished to have certain provisions flow down to lower tier sub-subcontractors, and were explicit in highlighting which those provisions were.  However, those clauses do not discount the explicit and specific language in the flow down provision in Section 10.  The language of those clauses simply state that FPL will include similar clauses or similar language in any of the sub-subcontracts that it enters into.  And while APTIM would have the court apply the canon of *expression unius est exclusion alterius* to negatively infer that there was no drafter-intent to have Section 31's forum language be passed on to sub-subcontractors, other canons of construction outweigh such a limited reading.  None of the clauses APTIM points to refute the clear, plain language of the flow down provision in Section 10, and the supremacy-of-text canon and the presumption of validity both support applying the plain meaning of Section 10, rather than applying APTIM's reading to invalidate Section 10's flow down language.  The Court finds it more likely that the drafter(s) employed these clauses to ensure that the lower tier sub-subcontracts contained the specific language of those clauses, rather than relying on the general principle of flow-through obligations.  And nothing in those clauses changes the fact that the forum selection clause imposed an obligation on both FPL and APTIM regarding the location of any litigation, and the flow down provision stated that all lower tier sub-subcontractors, like Multiscaff, are bound to all of FPL's obligations contained in the APTIM-FPL

---

Subcontractor shall include corresponding language in all subcontracts reflecting Company's statutory employer status.

. . .

Subcontractor shall include the full text of this clause in any Sub-subcontract or Purchase Order executed to procure work or materials as a part of the Subcontractor's performance under the Subcontract.

. . .

Subcontractor agrees to include similar clauses in all of its subcontracts, and Subcontractor will ensure that this requirement flows down to all tiers of sub-subcontractors.

(APTIM-FPL Subcontract 15, 16, 22.)

Subcontract.  Therefore, the court finds that the weight of interpretive canons and the bolstering principle that ambiguous contract terms are to be read against the drafter all support the conclusion that the Section 10 flow down provision of the APTIM-FPL Subcontract encompasses Section 31's forum selection clause.

3.  <u>Application of Forum Selection Clause in Non-Breach-of-Contract Suit</u>

Having determined that the forum selection clause flows down to bind Multiscaff, the Court turns to the question of whether the forum selection clause applies to the present litigation. APTIM argues that even if it were to flow down to Multiscaff, the forum selection clause does not apply here because it does not encompass non-contractual disputes. In response, Multiscaff argues that the forum selection clause is broad enough to cover the present dispute.  The forum selection clause states, in relevant part, that "the sole and exclusive venue for any litigation . . . relating to or arising from any Subcontract, these T&C's, any Project, or any Subcontract Work . . . shall be the United States District Court for the Eastern District of Virginia."  (APTIM-FPL Subcontract 21.)

The text of the forum selection clause encompasses a broad range of suits that relate or arise out of the Subcontract Work.  The forum selection clause does not limit the suits to only breach of contract actions.  In fact, by using "relating to or arising from . . . any Subcontract Work," rather than merely " . . . any Subcontract," the forum selection clause purposefully includes potential non-breach-of-contract actions that could arise or relate to the Subcontract Work being done at NFS Diego Garcia.  In this suit, there is no breach of contract claim, but Multiscaff's actions for Unjust Enrichment, Quantum Meruit, and Conversion directly arise out of and relate to the Subcontract Work that was being performed by the parties at NSF Diego Garcia.  Thus, the broad language of the forum selection clause here encompasses the pending actions.  *See Bartels*

20

*v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 678 (4th Cir. 2018) (holding that the "in connection with" language in a forum selection clause that read "arise out of or in connection with or by reason of this Agreement" extends it to "every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute"); *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 95 (4th Cir. 1996) ("[A] claim may arise outside of an agreement and yet still be related to that agreement; we must analyze the relationship between the claim and the agreement without regard to 'the legal label assigned to the claim.'" (quoting *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 319 (4th Cir. 1988))); *Lewis v. Jayco, Inc.*, No. 3:18CV00100, 2019 WL 3797357, *3 (W.D. Va. Aug. 12, 2019) (applying a forum selection clause that read "[a]ny controversy, dispute or claim arising out of or relating to this Agreement or breach thereof . . ." to a non-breach-of-contract action).

## C. Enforcement of the Forum Selection Clause

Having determined that the forum selection clause flows down to the lower tier sub-subcontracts and encompasses the present action brought by Multiscaff, the Court must now decide whether it should enforce the forum selection clause in this case.  In general, federal courts apply federal law when deciding when to enforce a forum selection clause.  *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 650 (4th Cir. 2010) (aggregating cases).  Normally questions regarding the enforcement of forum selection clauses arise in the context of *forum non conveniens* and Section 1404(a), but the Court finds that the principles that those cases rely on are applicable here, given the unique factual circumstances and party posture.

### 1. Permissive or Mandatory

 The first inquiry in determining whether the forum selection clause should be enforced is ascertaining whether the forum selection clause is permissive or mandatory.  "As a general matter,

courts enforce forum selection clauses unless it would be unreasonable to do so." *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 470 (4th Cir. 2018), *as amended* (Mar. 27, 2018).  However, if the forum selection clause is mandatory rather than permissive, there is a presumption of enforceability and the party seeking non-enforcement bears the burden of proving why it should not be enforced.  *Id.* at 470, 472.  "A mandatory clause requires litigation to occur in a specified forum; a permissive clause permits litigation to occur in a specified forum but does not bar litigation elsewhere." *Id.*  at 470.  More specifically "[a] forum selection clause is permissive unless it contains 'specific language of exclusion.'"  *Id.* at 472 (quoting *Albemarle Corp.*, 628 F.3d at 651).

In *BAE Systems*, the Fourth Circuit concluded that the forum selection clause at issue was permissive rather than mandatory because it lacked "specific language of exclusion."  884 F.3d at 472.  The Fourth Circuit noted that the use of "shall" by itself was not enough to render the clause mandatory, and instead the clause needed to contain words like "sole," "only," or "exclusive." *Id.*  Here, the forum selection clause clearly contains the required language to render it mandatory as it states that the Eastern District of Virginia "shall be" the "sole and exclusive venue" for the litigation.  Thus, the forum selection clause here is mandatory.  *See Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 210 n.7 (4th Cir. 2022) (holding that a forum selection clause that stated the forum was the "exclusive jurisdiction" was a mandatory forum selection clause).

### 2. Presumption of Enforceability

As stated above, if the forum selection clause is mandatory, there is a presumption of enforceability and the party seeking non-enforcement bears the burden of proving why it should not be enforced.  *BAE Sys. Tech. Sol. & Servs., Inc.*, 884 F.3d at 470, 472.  A mandatory forum selection clause is "given controlling weight in all but the most exceptional cases."  *Atl. Marine*

*Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 60 (2013).   The Fourth Circuit, in *BAE Systems* also provided a judicial gloss on *Atlantic Marine* and noted that *Atlantic Marine*'s presumption in favor of the forum selection clause and its altering of the Section 1404(a) analysis only occurs if the forum selection clause at issue is mandatory.   *BAE Sys. Tech. Sol. & Servs., Inc.*, 884 F.3d at 471–72.

In *Atlantic Marine*, the Supreme Court ruled that Section 1404(a)[4] was the appropriate means for a defendant to challenge a plaintiff's choice of venue via a valid forum selection clause. 571 U.S. at 60.   Notably the Court stated that "[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause" and that "[o]nly under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied."   *Id.* at 62.   Even though the present case's posture is different than *Atlantic Marine*, as it is the Defendant that is trying to fight the application of a forum selection clause rather than moving to enforce one, the principles still guide the Court's analysis.   The Supreme Court in *Atlantic Marine* did not specify what constituted "extraordinary circumstances," but in a prior decision, *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), the Supreme Court articulated several factors that could find a forum selection clause "unreasonable." Under *The Bremen*, a forum selection clause could be found "unreasonable" if:

> (1) [its] formation was induced by fraud or over-reaching; (2) the complaining party "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) [its] enforcement would contravene a strong public policy of the forum state.

*Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (summarizing *The Bremen* factors). In *BAE Systems*, the Fourth Circuit concluded that *Atlantic Marine* built upon *The Bremen* and that

---

[4] "Section 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system."   *Atl. Marine Const. Co.*, 571 U.S. at 60.

*The Bremen* still constituted valid case law.  *BAE Sys. Tech. Sol. & Servs., Inc.*, 884 F.3d at 471 ("*Atlantic Marine* thus 'reaffirms *Bremen*'s identification of a strong federal public policy supporting the enforcement of forum selection clauses,' even in the context of [a] *forum non conveniens* analysis.").  Thus, the Court will give the forum selection clause its presumptive weight under *Atlantic Marine*, but also conduct a reasonableness analysis under *The Bremen*.

In this case, APTIM has not established (1) that the clause was induced by fraud or overreaching; (2) that APTIM will be deprived of its day in court due to grave inconvenience or unfairness; (3) that the fundamental unfairness of the chosen law will deprive APTIM of a remedy; or (4) that the enforcement of the clause would contravene a strong public policy of the forum state.  *See Allen*, 94 F.3d at 928.  Additionally, APTIM fails to offer any "exceptional reasons that the public interest would be served better" in refusing to enforce the forum selection clause.  *Whitaker*, 42 F.4th at 211.  Thus, the Court finds that enforcement of the forum selection clause is "reasonable" and there exist no "exceptional circumstances" that warrant not enforcing it in this case.  *See id.*; *Atl. Marine Const. Co.*, 571 U.S. at 60.

### D. Effect on Personal Jurisdiction

APTIM alleges that the Court lacks personal jurisdiction over it.  However, forum selection clauses can act as waivers of personal jurisdiction.  *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964) ("[I]t is settled . . .  that parties to a contract may agree in advance to submit to the jurisdiction of a given court[.]"); *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 281 n. 11 (4th Cir. 2009) ("We note in passing that a valid forum selection clause, unlike a choice of law clause, may act as a waiver to objections to personal jurisdiction."); *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements.").

24

Here, the forum selection clause at issue provides that the Eastern District of Virginia shall be the "sole and exclusive venue for any litigation . . . relating to or arising from [the] Subcontract." Thus, the Court can fairly interpret this language from the APTIM-FPL Subcontract, which APTIM presumably drafted or at the very least consented to, as waiving a challenge to personal jurisdiction.

### E. Effect on Venue

Additionally, APTIM argues that venue is improper in this district under 28 U.S.C. § 1391 and thus the case should be dismissed pursuant to 28 U.S.C. § 1406(a).  The Supreme Court has held that "[w]hether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in § 1391(b).  As a result, a case filed in a district that falls within § 1391 may not be dismissed under § 1406(a) or Rule 12(b)(3)."  *Atl. Marine Const. Co.*, 571 U.S. 49, 56 (2013). Thus, in ruling on APTIM's 1406(a) motion, the Court must look beyond the forum selection clause itself and analyze the factors contained in § 1391(b).

Venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  28 U.S.C. § 1391(b)(1).  A "corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction."  *Id.* § 1391(d).  As APTIM readily admits in its pleadings, in this case "the venue inquiry collapses into the personal jurisdiction analysis."  (Mem. Supp. Mot. 16.)  Having already determined that the forum selection clause grants personal jurisdiction over APTIM, the Court similarly concludes that venue is proper in the Eastern District of Virginia because of the operation of the forum selection clause.[5]

---

[5] The Court notes that at the very end of its Reply brief, APTIM argued that this case should be transferred to the Alexandria Division of the Eastern District of Virginia, as that is the only division with a nexus to the parties

## V. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (ECF No. 19) will be denied.  An appropriate Order shall issue.

_____ /s/
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: August 9, 2023

---

and issues in dispute.  (Reply at 12–13.)  Because defective division-level venue is not per se grounds for dismissal, Fed. R. Civ. P. § 1406(a), and because Plaintiff has not had the opportunity to address the request for transfer to the Alexandria Division, the Court will persist with its denial of the present Motion to Dismiss and permit Plaintiff an opportunity to address the question.  An order to that effect will follow, separate from the Order on Defendant's Motion to Dismiss.